I'd like to begin with the Supreme Court's decision in Hudson, not only because it's the seminal case in the area, but more importantly, because the district court's decision conflicts with Hudson because it's fundamentally incompatible with the system that Hudson institutes, and that's why I'm going to reserve three minutes for rebuttal, Your Honor. And the next thing I'm going to say, I think, is the most important thing I'm going to say all morning, and, in fact, everything else that I say this morning will be an application of the next thing I say. What I'm going to say is that the significance of this, of recognizing that Hudson institutes a system, is that with a system, if you tinker with one part of it, you can throw the entire system off of kilter. For example, with a car engine, if you take out the spark plug, you've messed up the whole engine. And that's what the district court's decision does with the Hudson system. Before I can explain how it does that, I need to just briefly review the Hudson system to make clear what it is. Isn't the principle of Hudson a question of notice? Isn't that what it's about? It's not to give you a system. That's something that was devised from Hudson. Hudson sets up a principle involving the First Amendment. It does concern notice, Your Honor, but Hudson goes well beyond notice. There are other aspects of Hudson that have nothing to do with the notice. For example, the requirement to give fee payers a neutral fact finder to resolve a challenge to the fair share fee, that goes beyond notice. The requirement that the union escrow certain funds while that challenge is pending. Notice is very important, and notice is one of the important parts of Hudson. But Hudson sets up an entire system for the union to manage the fair share fee, including giving the notice, including but not limited to notice. And it tells the union, most importantly for my purposes today, how the union is to calculate what it is giving notice of. And that's what I think needs to be examined here. And the question of whether or not that is consistent with a basic principle, which is a First Amendment right. That these folks have a right to, on the basis of the First Amendment, to have adequate notice where they can exercise their First Amendment right. That's what I hope that you'll give us. Because I think it's more important, the Constitution, I think, trumps any wooden application of Hudson if the First Amendment is jettisoned as a result of that analysis. So that's where I would need some help. Okay. I will explain that, Your Honor. What Hudson says is that the nonmembers have a right to notice of what the fair share fee is going to be in the coming year. And really, we say fair share fee, there's really two fees. There's the fee for objectors and there's the fee for nonobjectors. But it tells the union how to calculate the objector fee, which is what it has to give notice of. The objectors have a right not to pay for nonchargeable expenses. But the Hudson notice has to be given before or at the beginning of the fee year. So at that point, the union doesn't know what its chargeable and nonchargeable expenses are going to be during the fee year. So Hudson tells it how to give notice, how to figure out that question, the proportion of chargeable to nonchargeable. Hudson said you base it on audited figures. And because you cannot audit future expenditures, you can only audit what's happened in the past, you have to base this year's chargeable percentage that you're giving notice of and giving people a chance to say that's all I want to pay. You have to base it on the chargeable expenditures from the prior year. And that's what you're giving notice of. But you have to? Suppose the union knows that there's a big election coming up and they know they're going to be spending money for a political process and they know that. Can the union just say, but we didn't do it last year, so it's OK? We don't have to give any notice of what we know we're going to do? No. Well, yes, because it's a question, really the question here is not what can the union do. The question is what is the union obligated to do under the First Amendment? And the First Amendment does not obligate the union to do anything other than base the notice on the prior year's spending. That's what Hudson says. And it says the union cannot be faulted for basing the chargeable percentage on the last, on the actual spending the prior year. The chargeable expenses from the prior year compared to the total expenses. So that's what Hudson says. Your interpretation of Hudson, which is under different facts, your interpretation of Hudson is even if there is a violation of the First Amendment, that is, the union knows fully well that they're going to develop this money, fight back, whatever. They can keep that secret and then worry about it next year. In the meantime, we'll have months of violation of First Amendment rights of individuals. No, that's not my position, Your Honor. The reason it's not my position is because Hudson defines what a violation of the First Amendment is. Hudson sets up a system. Now, the Supreme Court in Hudson could have instituted a system where it said we're going to protect First Amendment rights by requiring the union to look at what it did before but modify it by what it intends to do this year. It didn't do that. What the Supreme Court, the Supreme Court defined what First Amendment rights are in this context by saying the question is we have to balance the rights of the fee payers against, without restricting the right of the union to collect expenses for collective bargaining. Hudson is a balancing test. So to say, well, by following Hudson, you're ignoring that you're violating the First Amendment, that's incorrect, I submit, Your Honor, because Hudson defined what a First Amendment violation is. And that's why in Grunewald, this Court said that the union need not enact the system that is the most solicitous of fee payers' interests. Rather, all the union has to do is reasonably accommodate the fee payers. Now, it's not saying the union can violate Hudson. It's saying that all — I mean, violate the First Amendment. It's saying that all the First Amendment requires is that the union accommodate the fee payers. And the way Hudson works is it evens out every year. Because one year — for example, let me use the — Well, I mean, Hudson was a — even the Supreme Court said as a practical matter, this is the way it can work. In other words, they recognize the reality of sometimes being — an entity being unable to forecast with precision what its budget was going to be for next year, what the actual expenditures are next year. And so I think what you're talking about makes perfect sense when you're doing a year-to-year where there's not much fluctuation. I think the question is, if there is an extraordinary expense that's anticipated, does that take it out of the Hudson rubric? If everybody knows that there's an extraordinary expense, doesn't that require a different system? The answer is no, Your Honor, and let me explain why. First of all, I'd like to say that's not what the district court relied on. The district court said, I don't have to even look at whether there was an extraordinary circumstance here. I'm just applying Hudson, which it wasn't. But the answer is no, and the reason the answer is no is because you're assuming that there is a sort of pattern of union spending, your question assumes, and I believe the district court assumed this, too, that's relatively consistent from year to year, so that you're now looking at whether there's an extraordinary event that's taking the system out of its normal parameters. That's not, in fact, what happens. Union spending varies widely from year to year. In the brief, I believe I gave an example that if year one is a year where they're bargaining a collective bargaining agreement, chargeable expenditures may be very high, 90 percent. The next year, let's say there's a political election. The union is doing voter education, get out the vote. All of that is nonchargeable. The expenses will fall precipitously. Yet the Hudson system contemplates that. It allows the union to charge the 90 percent derived from the first year in the second year, and the reason is because it will even out in the third year. In the third year, the fair share fee, the percentage, will be very low. It may be 60 percent, even though the expenses in year three may be back up to 90 percent. It just lags in time. That is the essence of the Hudson system. And the reason why the district court's decision is wrong here, there's at least many reasons. But that is an anticipated pattern you're talking about. In a sense. And I'm just talking about something that doesn't fit the pattern at all. Something that is. But the pattern is that there is no pattern, Your Honor. That's the point. The pattern is it's all over the map. Well, then how can you say with assurance that it evens out? Oh, because each year you're basing it on the prior year, so that in year two, you're in essence giving people back money that they overpaid in year one or collecting from them money that they underpaid in year one. In year three, you're evening out for year two. In year four, you're evening out from year three. And that's why the district court's decision is so wrong. Because Mr. DeVane, is that it? Yes. Mr. DeVane, what about the person that's no longer working there? You say it will all work out in year three, and if you continue to work there, that's – I think you're right. It will work out. What if you've left? Do you have some claim against the union or something? No. I would say no, Your Honor, because that's – that's endemic in Hudson. No matter what happens, that's – that's taken into account in Hudson. The system that the Supreme Court set up, they didn't say in Hudson, oh, and by the way, if the person leaves, you have to pay them what they – what you owe them. Or what if the person left and you hadn't collected all the money that you should have collected from them? In other words, the year when the fair share fee is actually lower than what you're charging, you don't get to go after them for the money after they leave. That's just – it's part of the compromise of the system. The Supreme Court realized in Hudson there is no perfect system. It said absolute precision cannot be expected or required. There – you cannot fault the union for using this retrospective method. It's an imperfect system because it's balancing the interest. There is no way to do it that perfectly serves everyone's interest. But if I can just get back to the – But the issue here is speech. And some people may fully endorse speech given if it's – the funds are expected in collective bargaining. Some people may not endorse speech if they anticipate it's going to be used in the future. I mean, that's the – that's the question. I mean, I understand your argument from an economic sense, but – But that's the system that Hudson set up, Your Honor. It will always be the case that there will be a year – not every year, but there will always be a year where you are collecting, let's say, at 90 percent chargeable from last year, and really you're only doing 70 percent chargeable this year. So you are inevitably spending someone's money for nonchargeable purposes when they didn't want you to. Your argument's with Hudson, then, if you don't like that. It's not with what the union did. That is intrinsic to Hudson, but yet that's the system that Hudson decreed. And in this Court, Prescott said – in Prescott, this Court admonished the lower court, saying the problem is that the lower court didn't believe that Hudson meant what it said in that same footnote. Footnote 18 is what – is what Prescott was referring to, the same footnote that says precision cannot be required, no one can fault the union for basing it on last  year, this Court said we believe Hudson meant what it said in footnote 18. And if you're going to be consistent with Prescott, you have to say we believe what – that Hudson meant what it said in footnote 18. And there's no exception to this at all, as you read Hudson. That is, the union could double, quadruple, ten times the dues for a political purpose, could do it, and the person who would not have a notice would have to pay it out, but they'd get it back. Your Honor, are you talking about in midyear, or are you talking about at the beginning of the year? Certainly at the beginning of the year, the union has to – When you have midyear crises. I'm sorry? When you have midyear problems that happen after the Hudson notice. Well, yes. I'm saying that Hudson does not require, the Constitution does not require a midyear notice. Now – Under any circumstance. Under any circumstance. Okay. Now, what it requires you to do, if someone has already objected to paying for nonchargeable expenses, and your rate is 50 percent, let's say, this year, in the year in question is 56.35 percent, you can't charge them more than that, 56.35 percent of the increase if they're an objector. And the union didn't do that here. The union did what Hudson said. It applied the objector percentage from the year in question of the year before in this year, and that's what it did with the increase as well. And that's what Hudson says you do. Now, in fact, in this year, if you look at the statistics, no one ended up paying for nonchargeable expenses that they were opposed to. No one. In fact, the union was undercollecting money, because the fair share fee rate in this year in 2005 was based on the 2004 spending. It was 56.35 percent. Even with the increase, the actual spending in 2005 ended up being 68.80 percent chargeable. They were actually undercollecting in 2005 compared to what the ultimate spending ended up being. So in your situation, Judge Wallace, even if you believed that there should be a midyear notice when the nonchargeable spending goes way up, that's not this case. In this case, the nonchargeable spending went down in 2005, even with the increase and even with the fightback fund. Roberts. You're down to less than 30 seconds. Do you want to reserve or do you want to continue? I'd just like to make one point as to why, because this is the point I've been trying to make. The district court's decision interferes with the Hudson system because if you say that you have to, because you're doing this increase, you're going to give people a break and not collect as much from them because of this increase, you can't go back and get that the following year. When you base it on the prior year's spending, it then fouls up that number. It's sort of hard to explain. But you're giving them a windfall. You're giving them twice, allowing them not to pay for something, and you can never go back and collect it. So just like this year, in 2005, they should have been paying 68.80 percent if you were to base it on the actual spending in the current year. They were paying 56.35 percent. If you had let them pay less than that 56.35, say 25 percent, the next year you're at 68.80. You can never go get that missing 25 percent. That's why I'm saying you have to look at Hudson as a system. And what the district court did fouls up the system. It makes the system break down. Thank you, counsel. Your time has expired. Good morning, and may it please the Court. My name is James Young, and I represent Diane Knox, seven other named plaintiffs, and the class of thousands of nonmember employees in the state of California. This case presents, as the Court recognizes, this case presents an unusual application of Teachers Local No. 1 v. Hudson. And I must say that I'm quite surprised to hear the argument that CSEA is making to this Court. Hudson says an audit. We can't do an audit. Therefore, Hudson, it does not violate Hudson. Interestingly, the same argument that an audit is required was not, was denied in Wagner or Herrick, and I apologize for not getting it specific. But smaller local unions, according to the union in those cases, don't have to provide audits. So I'm not sure which this Court is to believe. I think the main point has to be, Hudson is important in discussing the typical case of normal union dues from year to year, and it's controlling. But we're not talking about the normal case here. Why not? There's a variance. One can argue, as we've questioned, about the extraordinary expense. But it appears to me on this record that it goes up and down. And you've heard your opponent's argument that, in fact, they didn't collect enough money for the year. Well, that is not true, Judge Thomas. Okay. Well, rather than dig into that, why don't you, I mean, what takes this, why isn't this case a normal, just a normal year in the life of the union and its objecting employees? Because the union imposed a special assessment. It said, this assessment will be for these purposes. Only after people, or hue and cry, was raised, not only among nonmembers, but among members, union members who resigned, like Bob Conover, one of the plaintiffs in this class. Only after that did the union say, oh, no, no, no, no, we're going to spend some of it on things we said we weren't going to spend it on before, the normal expenses. And even if you look into what it was charged for, some of these ballot initiatives, which the union claims are chargeable, even that doesn't pass muster under Lenner, which limited chargeable political expenditures to those for the ratification or implementation of a collective bargaining agreement. The union here is not limiting, did not limit chargeable expenditures to Lenner for the year in question for the monies that were spent from the fund. It was not equal, it was not more than the chargeable percentage they were claiming and collecting. It was, in fact, only 28 percent. I would refer the Court to the union's opening brief at 10. And 27.35 percent of the 3.7 million expended from the fund in 2005, and the 8.7 was chargeable. That's what they deemed chargeable. And I quote that at page 14 of our responsive brief. In fact, the percentage was much lower. So the claim that the union didn't is convenient for purposes of litigation. The CSEA subtext here, it seems to me, is that the Hudson creates some kind of entitlement, in this case, to charge last year's rate when what is intended with a special assessment for political purposes is entirely different than the normal balance of union spending. This is a special assessment for limited purposes for a limited period of time. And special assessments are different. California law, the very statute which authorizes fair share fees, specifically talks about three categories, union dues, assessments, and there's one other one that's not really relevant to this case. But it makes a distinction. The food fare case makes a distinction between normal union dues and assessments under the National Labor Relations Act. And in this case, Judge England's practice and his action was an application of the principles of Hudson, of Abood, to make the balance between preventing the union from forcing nonmembers to subsidize their ideological activities and allowing the union to collect fees for its legitimate bargaining activities. And the balance notion is something the Supreme Court diminished somewhat in Davenport. The union doesn't have a right to nonmembers' fees. Nonmembers have a constitutional right to refuse to pay for union political activities. But the union has only a statutory interest in collecting nonmember fees. So the notion that there's some kind of balance here is not supported by the case law. And certainly, Grunwald's notion of some lesser standard being applied has been diminished significantly by the Supreme Court's subsequent decision in Miller v. — excuse me, Airline Pilots Association v. Miller and footnote 4, which goes out of its way to state that the interests at issue are not equivalent. The union, in this case, states that its internal representations, its internal authorizing memo, Exhibit A to the complaint, Exhibit D, the August 25th memo, to nonmembers and union members alike, saying it was only going to spend this money on — excuse me, that it was going to spend this money on political activities, that these listings were merely illustrative. However, a careful examination of those documents suggests — state nothing that those fees are going to be for purposes other than those political purposes. They don't say, we're going to spend things on such-as, limiting language, which would allow the claim that they're illustrative. In fact, what they say are, we are not going to spend it on normal union activities. At least that's what the — the counsel that passed the special assessment was told in Exhibit A to the complaint. Judge England's decision is, in fact, entirely consistent with Hudson and its first public sector forced unionism case, devising a way of preventing compulsory subsidization of ideological activity by employees who object thereto the constitutional interest, without restricting the union's ability to require every employee to contribute to the cost of collective bargaining activities, the statutory interest. The Supreme Court's statement of purpose — excuse me — has special application where, as here, the Court is presented with special assessment, not ordinary union dues. Judge England below recognized the charge of Abood and recognized the Court's obligation to be at least as creative in responding to CSEA's extraordinary actions as CSEA was in attempting to extract from unwitting or declared — declaredly unwilling nonmembers' fees for nonchargeable political and ideological activities. In so doing, he conscientiously applied this Court's prior decision-making in crafting a remedy and required CSEA to provide a proper notice and pay nominal damages to employees whose rights it had violated. The important thing here is to recognize — not to lose track of the substance of Hudson for the form of Hudson. And I think Judge Wallace, you recognized that in one of your early questions. There's implied that. Hudson is more than an auditing case. It is, importantly, an auditing case. But it is more than that. And notice must be provided. Nonmembers who — it's one of the classes here — who failed to object to the original notice in June had no idea in June that the union was going to engage in such a system of massive political spending. And it's anti-rational to suggest that a system which — in which notice is so important can — your rights can be waived when a notice is the issue. Judge England's decision is entirely consistent with this Court's jurisprudence on the choice of remedies and the Supreme Court's mandate to devise a way of preventing compulsory subsidization of ideological activity. Indeed, the Court — had the Court below treated CSEA as bound by its own commitments, guaranteeing that the fund was to be used for nonchargeable purposes, and it did say indeed to the complaint, it would have required a refund of all of the special assessment from those who objected, a remedy which is decidedly not ordered. Unless the Court has any questions, any further questions, I will leave it. I think we have both your arguments at hand. Thank you both for your arguments. You used up your time. I'm sorry. So we will be in recess for the morning. Thank you.
judges: Wallace, Thompson, Thomas